AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

Central District of California

United States of America

v.

HAILEY HAZEL MORRIS, and
FRANKLIN DONAN,

Defendants

> **LODGED**
> CLERK, U.S. DISTRICT COURT
> JAN - 7 2025
> CENTRAL DISTRICT OF CALIFORNIA
> BY: ___rsm___ DEPUTY

Case No.  **2:25-mj-00055-DUTY**

> **FILED**
> CLERK, U.S. DISTRICT COURT
> January 7, 2025
> CENTRAL DISTRICT OF CALIFORNIA
> BY: ___CLD___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344, 1349, 1028A | Conspiracy to Commit Wire and Bank Fraud, and Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Lyndon Versoza*
_____
*Complainant's signature*

Lyndon Versoza, Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  January 7, 2025
_____
*Judge's signature*

City and state:  Los Angeles, California

ALKA SAGAR
Hon. ~~Patricia Donahue~~, U.S. Magistrate Judge
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

### Count One, 18 U.S.C. § 1349

Beginning in or before 2024, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAILEY HAZEL MORRIS and FRANKLIN DONAN, and others, conspired to commit wire and bank fraud, in violation of Title 18, United States Code, Sections 1343 and 1344.  In furtherance of the conspiracy, defendants MORRIS and DONAN would steal the identifying information of their victims, including by burglarizing their homes. Defendants MORRIS and DONAN would use counterfeit identity documents to impersonate their victims and steal the contents of their bank accounts, including from Wells Fargo Bank, which was then federally insured.  Defendants MORRIS and DONAN would also impersonate their victims in order to rent furnished apartments.  Defendants MORRIS and DONAN would also use counterfeit vehicle titles and counterfeit identity documents to sell stolen cars to unwitting buyers.   Defendants MORRIS and DONAN used interstate wires to defraud their victims throughout this conspiracy.

### Count Two, 18 U.S.C. § 1028A

Beginning in or before 2024, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAILEY HAZEL MORRIS and FRANKLIN DONAN knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire and Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

## AFFIDAVIT

I, Lyndon A. Versoza, being duly sworn, hereby depose and
state as follows:

## I. TRAINING AND EXPERIENCE

1.   I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  I have been a federal law enforcement officer since
2002.  Currently, I am assigned to the USPIS Contraband
Interdiction and Investigations Team in Los Angeles, California,
where I am designated as a Money Laundering Specialist. In this
capacity, I am responsible for investigating criminal violations
of money laundering and structuring laws, such as when the
services of the United States Postal Service are employed by
criminals as part of the means to launder or conceal illicit
funds, and/or avoid financial reporting requirements.  I am also
one of seven Postal Inspectors in the U.S. currently designated
by USPIS as a Subject Matter Expert ("SME") in money laundering
investigations.  As a SME, I have spoken at money laundering
conferences and provided training to my colleagues, the
financial and banking industry and other law enforcement agents.
I have also received both formal and informal money laundering
training from USPIS and other government and private agencies.
During the course of my career, my money laundering
investigations have led to the successful seizure of assets

valued at hundreds of millions of dollars. During my over 19-year career as a Postal Inspector, I have investigated: thieves, burglars, rapists, mass-shooters, murderers, armed robbers, prison and street gangs, drug trafficking organizations, and perpetrators of financial violations (including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters). For approximately five years, prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally. In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security. In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counterterrorism and smuggling operations.

3.    I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel

and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II. SUMMARY AND PURPOSE OF AFFIDAVIT: SEARCH AND ARREST WARRANTS

4.  This affidavit is made in support of a criminal complaint against and arrest warrants for:

      a.  HAILEY HAZEL MORRIS ("MORRIS") and

      b.  FRANKLIN DONAN ("DONAN")

for violations of 18 U.S.C. §§ 1349 and 1028A (conspiracy to commit bank and wire fraud, and aggravated identity theft).

5.  This affidavit is made in support of an application for a warrant to search the apartments used by MORRIS and DONAN for evidence of violations of 18 U.S.C. §§ 1028A, 1341, 1343, 1344, 1349, 1956 (aggravated identity theft, conspiracy to commit mail, wire, and bank fraud, and money laundering), and 21 U.S.C. §§ 841, 844, and 846 (simple possession of controlled substances and drug trafficking) (the "Subject Offenses"), as described more particularly in attachment B, which is incorporated by reference.  The locations to be searched, which is described more particularly in attachment A which is also

- 3 -

incorporated by reference, are:

      a.   234 SOUTH FIGUEROA STREET, APARMENT 1738, and ASSIGNED PARKING SPACE 638, LOS ANGELES, CALIFORNIA 90012 (the "SKYE RESIDENCE"); and

      b.   123 SOUTH FIGUEROA STREET, APARTMENT 1515, and ASSIGNED PARKING SPACE 10B on P1, LOS ANGELES, CALIFORNIA 90012 (the "PROMENADE RESIDENCE").

A. Summary of Investigation

    6.   HAILEY MORRIS, FRANKLIN DONAN and Christopher Halawani are identity thieves who have conspired to use stolen identities to purchase cars, then sold these cars for cash to unwitting buyers.  These victims later found out the cars they bought have been reported stolen.  MORRIS and DONAN also burglarized the residence of a deceased victim, Rosemary Peck's ("Victim Peck"), and using bank information taken from inside the residence of Victim Peck, forged notary documents with Wells Fargo Bank, and stole thousands of dollars of funds from Victim Peck's accounts without her or her estate's permission.  MORRIS also uses stolen identities to rent apartments.  This included an apartment rented under the stolen identity "Anis Gars."  MORRIS also has an outstanding warrant for her arrest for California state violations of larceny and grand theft. According to Los Angeles County Court records I have reviewed, DONAN was sentenced to two years of probation beginning on September 1, 2023, for violations of California Penal Code 530.5 (Identity theft).

- 4 -

DONAN is currently on probation with the condition that he "SUBMIT [HIS] PERSON AND PROPERTY TO SEARCH AND SEIZURE AT ANY TIME OF THE DAY OR NIGHT, BY ANY PROBATION OFFICER OR OTHER PEACE OFFICER, WITH OR WITHOUT A WARRANT, PROBABLE CAUSE OR REASONABLE SUSPICION."

7.    On December 23, 2024, I learned from the apartment managers of the SKYE RESIDENCE they recognized DONAN from a photo I sent and believe he was residing at SKYE RESIDENCE under the name of a victim "David Regalado."  The apartment manager also sent me a photo of "David Regalado" which was uploaded to the apartment application system during the application process. I recognized the photo of the purported David Regalado as DONAN. The apartment manager also sent a photo a white Tesla bearing the California license plate number "9LXW516," which is a vehicle registered to MORRIS parked at ASSIGNED PARKING SPACE 638 for the SKYE RESIDENCE.

8.    Around the same time, I learned from the apartment managers of the PROMENADE RESIDENCE they also recognized DONAN and MORRIS from the photos I sent.  The apartment manager said they shared an elevator with MORRIS and DONAN has had problems with their security personnel and have police called regarding domestic violence.

- 5 -

III. <u>**PROBABLE CAUSE STATEMENT**</u>

B. <u>MORRIS Stole $20,000 Cash From a Victim by Selling Her a Stolen</u>
   <u>Car With a Fake Title</u>

9.     On December 3, 2024, I reviewed police reports from
Dublin, California Police Department. From reading these
reports, I learned the following:

a.     On February 26, 2024, a victim, Ranzaleen Lata
("Victim Lata"), reported to Dublin Police that on February 24,
2024, she met with a woman at Pet Smart Parking Lot who
identified herself as "Mariah Salvador Ortiz" to buy a Dodge
Charger (the "Charger").  Victim Lata previously answered a
classified ad on Craigslist in San Franciso to purchase the
Charger.  Victim Lata and her daughter met with the seller.  The
seller, later identified by police as MORRIS provided Victim
Lata with a real key to the Charger and what appeared to be a
legitimate title to the vehicle.  Victim Lata negotiated the
price of the car from $23,000 to $20,000 and paid $20,000 cash
to the seller. Victim Lata took a photo of the driver license of
the seller.  After the exchange, the seller left in a vehicle
waiting for her.

b.     When Victim Lata went to the DMV to register her
new Charger, she was informed by the DMV that the title she was
given for the vehicle was a forgery and the driver license the
seller used of Mariah Salvador Ortiz (MORRIS) presented to
Victim Lata was fictitious.

c.     Dublin Police did a follow up and confirmed with

- 6 -

the true owner UMI Asset LLC, a vehicle rental company. Dublin Police learned that the vehicle was a rental vehicle that had been impounded by a towing company.  A person with a fictitious rental agreement recovered the Charger from the tow yard.  This vehicle was later sold to Victim Lata.  The stolen Charger purchased by Victim Lata was impounded by police.  Victim Lata lost her $20,000 she saved to purchase the car.

   d. A police detective, Detective Bao, conducted research on previous police fliers involving fraud and identity theft, and fraudulent vehicle sales.  During the search, Detective Bao located a flyer from Belmont Police Department from 2019 which featured MORRIS and two others.  The detective reviewed MORRIS' photograph at the time of her 2019 arrest and believed MORRIS' photo bore an "extremely close resemblance to" the fraudulent seller, Mariah Salvador Ortiz, as depicted in the fictitious driver's license photographed by Victim Lata.  In researching MORRIS, Detective Boa learned of MORRIS' long criminal history, including convictions for identity theft.

   e. Police reviewed surveillance video from the purchase of the Charger and observed that MORRIS left in a white Mercedes with the California license plate number of "9JNW704" (the "Halawani Mercedes").  Police determined the Mercedes was registered to Christopher Halawani of Chatsworth, California.

   f. Victim Lata and her daughter were separately presented by an uninvolved detective, with a "double blind sequential photographic lineup" of an array of photos containing

people who were not involved in the crime and MORRIS.  Victim
Lata identified MORRIS as the person who pretended to be Mariah
Salvador Ortiz and sold her the stolen Charger.  Separately, and
without having the chance to consult with Victim Lata, her
daughter also identified MORRIS as the person who fraudulently
sold her mother the stolen Charger.

      g.   Based on the investigation conducted by Dublin
Police, the police obtained a warrant for MORRIS' arrest.

C. <u>MORRIS, Using a Stolen Identity, Sold A Car For Cash, Then Stole
The Car Back.</u>

    10.   The Halawani Mercedes again becomes important to the
investigation as it was used in another crime less than two
months later. I also read reports from the LAPD investigation
from which I learned the following:

      a.   In or about April 3, 2024, Parker Andersen
("Victim Andersen") purchased a 2020 Mercedes Benz (the Halawani
Mercedes) listed for sale on Craigslist for $23,000 in cash,
from a female who pretended to be Natalie Duarte.  (As explained
below, police later learned the person who used the identity of
Natalie Duarte was actually MORRIS.)  A few hours later,
Halawani and MORRIS went to the university where Victim Andersen
parked his newly acquired vehicle, the Halawani Mercedes, and
stole it back.  (In my training and experience, individuals who
sell stolen cars often steal them back because it is easy:  they
have every opportunity to make a duplicate key, and can often
track the vehicle through some form of GPS.  This enables them

- 8 -

to sell the same stolen car multiple times.)

   b. On April 8, 2024, Victim Andersen went to the LAPD Pacific Station to discuss the crime. Victim Andersen stated on or about April 1, 2024, he located a Craigslist ad in the San Diego marketplace for a 2020 Mercedes Benz AMG CLA 35. The vehicle was listed for sale for $30,000.

   c. On April 2, 2024, Victim Andersen contacted the seller through the Craigslist application. He received a reply, which included a cellular telephone number (714) 466-5748, for further contact. Victim Andersen stated he began a text conversation with the seller regarding the purchase of the Mercedes Benz AMG CLA 35. During the text conversation the seller made the following claims;

   i. The seller's name was "Natalie", the title was in the name of the seller; and the seller only wanted to accept cash, as they did not want to "report it."

   ii. Victim and "Natalie" agreed on a sale price of $24,000 cash. The Victim and "Natalie" agreed to meet at 5399 Playa Vista Drive on April 3, 2024.

   iii. On April 3, 2024, at approximately 1800 hours, Victim Andersen stated he met with "Natalie" at 5399 Playa Vista Drive. Victim Andersen requested they do a test ride to one of the local auto repair shops for a quick engine diagnostic check. Victim Andersen stated he drove, while "Natalie" rode in the passenger seat. Victim Andersen stated he drove to Pep Boys, located at 6136 W Manchester Avenue,

Westchester, CA.  Victim stated at approximately 1825 hours, he
and "Natalie" entered Pep Boys and requested an engine
diagnostic check but were advised they could not accommodate his
request.  Victim Andersen and "Natalie" then walked next door to
Advance Auto Parts, 6136 W Manchester Avenue, Westchester, CA.
Victim Andersen stated he and "Natalie" spoke with a customer
service agent and was informed a diagnostic check could not be
conducted since the check engine light on the vehicle was not
illuminated.

           iv.    Victim Andersen and "Natalie" left the
location and returned to his residence at 5399 Playa Vista
Drive.  Victim Andersen stated upon arrival, he requested the
vehicle's documents and to see "Natalie's" driver's license.
Victim stated "Natalie" complied and handed him the requested
items.  Victim stated he reviewed the vehicle's State of
California Certificate of Title document.  The information
listed on the document, included the correct vehicle make,
model, year, and vehicle license plate.  In addition, the listed
registered owner was Natalie Arlene Duarte at 1303 W Young
Street, Wilmington, CA 90744.  Victim Andersen stated he
reviewed a Department of Motor Vehicle (DMV) registration card.
The registration card, just like the Certificate of Title
accurately described the vehicle, and listed the registered
owner as Duarte, Natalie.  Victim Andersen stated the two
documents appeared to be real.  Lastly, Victim Andersen stated
he reviewed "Natalie's" California Driver's License, and to be

safe, he took a photograph of the California Driver License.

          v.     Victim Andersen stated after reviewing the Driver License he believed the person standing in front of him was the person in the image on the CDL belonging to Duarte, Natalie. Victim Andersen stated he believed all the documents to be real, and "Natalie" to be the registered owner, with authority to sell the vehicle, decided to finalize the purchase. Victim Andersen stated he went to his apartment and retrieved $23,000. Victim stated he paid "Natalie" $ 23,000 for the vehicle, they signed the Certificate of Title, she provided him with a handwritten contract/receipt, and one key fob.

          vi.    Victim Andersen stated immediately after she accepted the cash, she needed to leave. Victim stated "Natalie" was in a rush, and said her "Uber" was here, ready to pick her up. Victim stated "Natalie" hurried to an awaiting White Tesla Model X (winged door model with Black rims, hereinafter the "MORRIS TESLA"), entered the vehicle, and left.

    d.    Police later reviewed video from the Loyola Marymount University ("LMU") and determined the MORRIS TESLA with Black rims is the same color, make and model of the Tesla Model X observed on video later that same day at LMU campus taking Victim's vehicle.

    e.    Victim Andersen stated that night, at approximately 2025 hours, he drove on to the campus of Loyola Marymount University to attend class. Victim Andersen stated he parked his vehicle in Parking Lot I. Victim stated on April 4,

2024, at approximately 0015 hours, he returned to his vehicle, and observed it was missing. Victim Andersen stated he immediately texted "Natalie." Victim stated he did not get a response that night, and since has never received a response.

f.    Victim Andersen notified LMU Public Safety, and the following morning he notified Pacific Division of the stolen vehicle.

g.    On April 4, 2024, Pacific Area LAPD completed a Stolen Vehicle Report.

h.    Victim Andersen stated it was not until the morning of the 4th, that he learned at the police station that the vehicle's registered owner was Halawani, Christopher, and not Duarte, Natalie.

i.    Victim Andersen stated he went to both Pep Boys, and Advance Auto Parts to check for video cameras. Victim Andersen stated he was able to recover video from Pep Boys. Victim provided I/O with the video from Pep Boys and a copy of the text communication between him and "Natalie", the original Certificate of Title, the original vehicle registration document, and a photocopy of "Natalie's" CDL.

j.    LAPD Detective Levesque collected the Mercedes-Benz key fob and a buccal swab from Victim Andersen and booked both items into analyzed evidence.

k.    Detective Levesque ran the vehicle license plate and discovered the vehicle had been recovered by the Downey Police Department. The detective contacted Downey Police

Department and requested a copy of Recovered Stolen Vehicle
Report, CHP 180, Case No. 24-12931.

      l.    The detective also received an email from Rouzan,
Darryl, Public Safety Coordinator of LMU.  Rouzan provided the
detective with a copy of their investigation, and a link to
download video from LMU campus.

      m.    The detective reviewed LMU report, Case No. 2024-
00563, which documented the investigative steps taken by LMU
Department of Public Safety.  Two leads were significant in the
report, first was a License Plate Recognition (LPR) printout,
which documents vehicles' ingress and egress from LMU campus.
The printout documented on April 3, 2024, at 22:55:04 hours, the
Halawani Mercedes with the License plate number 9JNW704, exited
campus.  The Halawani Mercedes was followed by a White Tesla
Model X, Wisconsin License Plate No. DC40B44 at 22:55:10 hours.

      n.    The second is video evidence, which captured the
following:

      i.    April 3, 2024, at 2023 hours, Victim
Andersen parked the 2020 Mercedes Benz on LMU Campus Parking Lot
I.

      ii.    At 2251 hours, a White Tesla Model X,
dropped off a male at Parking Lot W.  The male walked to Parking
Lot I and entered the parked 2020 Mercedes Benz.  The White
Tesla, after dropping off the male, parked in front of Sacred
Heart Chapel and waited for the Mercedes Benz to exit the
parking lot.  After the male drove the Mercedes Benz out of

Parking Lot I, the White Tesla followed closely behind toward the exit. At 2255 hours, both vehicles depart campus together.

       o.    Detective Levesque also retrieved video from Advance Auto Parts and Pep Boys.

D. <u>Halawani Went To LAPD With MORRIS To Try To Pretend To Be a Victim.</u>

11.    On April 5, 2024, Halawani walked into LAPD Hollywood Station requesting information about the Halawani Mercedes. LAPD Officer Grossman met with Halawani at the front desk. Halawani stated he attempted to have his vehicle re-keyed at a Mercedes Benz dealership but was denied, after they informed Halawani his vehicle was reported stolen. Halawani made up a story which LAPD later confirmed was a lie: Halawani informed Grossman that he rented out the vehicle, but was having trouble contacting the renter. He stated after the renter failed to respond, he tracked his vehicle to the campus of LMU. Halawani informed Officer Grossman he picked up the vehicle from LMU.

12.    Halawani stated the renter still had one of his keys, so he attempted to have the Mercedes Benz dealership re-key his vehicle. That is when he claimed he learned of his vehicle being reported stolen. Halawani stated his vehicle was parked at his home since he didn't want to drive a stolen vehicle.

13.    Officer Grossman queried the vehicle license plate No. 9JNW704, and discovered Halawani was the registered owner, and the vehicle was reported stolen, but listed Victim Andersen as the victim, not Halawani.

14.  Officer Grossman called Andersen who stated on April 3, 2024, he purchased the vehicle from a woman named "Natalie" for $24,000 cash.  Victim Andersen stated he did not know the vehicle was owned by Halawani.  Victim Andersen did not know Halawani.  Victim Andersen stated the vehicle was stolen that same night, April 3, 2024, from LMU campus. Victim Andersen informed Officer Grossman he was going to obtain video from two auto repair shops that had video cameras and send them to Grossman.

15.  Officer Grossman stated on April 6, 2024, he received an email from Victim Andersen which contained video footage from Pep Boys.  Officer Grossman stated he began watching the video and immediately recognized the female suspect who sold Victim Andersen the vehicle.  Grossman stated the night Halawani walked into the lobby of Hollywood Station, a female, wearing the same clothing, black pants, black top, black Nike hat, matching the physical description, walked into the lobby with Halawani to use the restroom.  Grossman recalled speaking with Halawani, and hearing one of the officers working the desk, asked Halawani if the female was with him (Halawani).  Grossman recalled Halawani denied knowing the female.

16.  On April 8, 2024, Detective Levesque reviewed the video from Hollywood Station.  He observed the following:

a.  On April 6, 2024, at approximately 2043 hours, a female, later identified as MORRIS, wearing a black Nike Hat, black jacket, and black leggings, enters the lobby.  Following

- 15 -

right behind the MORRIS is Halawani. MORRIS walks to the lobby desk and asks to use the restroom (Per the officer's statement). Halawani is observed pointing to the bathroom. Officer Grossman walks out from behind the desk and is observed unlocking the bathroom door for MORRIS. Halawani is then observed meeting with Officer Grossman at the desk.  At 2046 hours, MORRIS exits the bathroom and walks out of the lobby. Halawani remained.

       b.   At 2042 hours, a White Tesla Model X parks on Wilcox Avenue, in front of Hollywood station (MORRIS TESLA). The wing doors open, and Halawani is observed exiting the rear passenger seat, and walking toward the front door of HOLLYWOOD Station.  Immediately after Halawani exits the MORRIS TESLA, MORRIS is observed following behind Halawani from the front passenger side of the MORRIS TESLA.  Halawani arrives at the lobby doors and waits for MORRIS.  As she approaches, Halawani opens the lobby door for MORRIS, allows her to enter the lobby first, then follows behind.

    17.  On April 25, 2024, Detective Levesque ran the Temporary Vehicle License Plate No. DC40B44 for the MORRIS TESLA.  He received a return to a 2024 Tesla Vin No. 7SAXCDE5XRF443193, with a registered owner of MORRIS, HAILEY at 206 W 6TH Street Apartment No. 540.

E. MORRIS and DONAN Looted the Account of a Dead Victim

    18.  On December 6, 2024, I read another LAPD report from Detective Levesque regarding MORRIS.  From this report, I

learned:

a.    On May 20, 2024, Detective Levesque interviewed a
Wells Fargo branch manager, Steve Menendez ("Manager Menendez")
about possible theft from a banking account belonging to a Wells
Fargo client, Rosemary Peck ("Victim Peck").  Manager Menendez
immediately recalled the name Peck.  Manager ~~Melendez~~ Menendez stated he
had an uneasy feeling about a transaction.  Manager ~~Melendez~~ Menendez
stated when he was reviewing the California Driver License of
the person who stood before him that day in the bank, "Emmanuel
Gonzalez," and thinking the man before him did not exactly match
the person's photograph on the CDL presented (the person
pretending to be "Emmanuel Gonzalez" was later identified as
DONAN, as discussed below).  Manager ~~Melendez~~ Menendez continued and
made the following statement to Detective Levesque:

b.    On May 16, 2024, at approximately 1100 hours, a
male, who identified himself as "Emmanuel Gonzalez" and a female
(later identified as MORRIS, as described below) attended a pre-
scheduled appointment with Christian Sanchez, Associate Banker,
regarding the closure of the Victim Peck bank accounts.  Manager
Menendez stated the couple completed the transaction, signing
all the required forms, but needed to have an internal Wells
Fargo Bank document notarized.  Manager ~~Melendez~~ Menendez stated the male
and female were in the bank for a couple hours, departing around
1530 - 1600 hours.

c.    Manager ~~Melendez~~ Menendez stated the following day, May
17, 2024, the couple returned at approximately 1300 hours with

the required form completed.  Manager ~~Melendez~~ Menendez stated he received the form and authorized the issuance of two cashier's checks from the Victim Peck account, effectively closing the Peck bank accounts.  Manager ~~Melendez~~ Menendez recalled the cashier's checks were deposited into the male's account, and he withdrew $10,000 in cash from the deposit.  Manager ~~Melendez~~ Menendez recalled they appeared to be a couple, as he observed and heard them argue at times.

19.  Manager ~~Melendez~~ Menendez provided the detective the following information regarding the account of man, Gonzalez, Emmanuel:

a.   The account was opened on May 14, 2024, at the Wells Fargo branch, located at 14059 Ventura Blvd, Sherman Oaks, CA 91423 in the name of Gonzalez, Emmanuel, Account No. 2614706204.

b.   On May 16, 2024, two Cashier's Checks were drawn on Victim Peck bank accounts, Prime Checking Account No. 3344132034, and Platinum Savings Account No. 1347218453.  The cashier's checks were issued to Gonzalez, Emmanuel:

i.    Cashier's Check 0061004804 in the amount of $13,611.20, drawn on the Victim Peck Checking Account.

ii.   Cashier's Check 0061004803 in the amount of $75,267.15, drawn on the Victim Peck Savings Account.

c.   A total of $88,878.35 was deposited into Gonzalez Account No. 2614706204.

d.   On May 17, 2024, $10,000 was withdrawn from Gonzalez Account in the Santa Monica Branch.

- 18 -

e.    On May 17, 2024, $8,000 was withdrawn from a branch in the San Fernando Valley.

20.    On May 23, 2024, Detective Levesque compiled a photographic lineup to include MORRIS in position No. 3. Detective Levesque compiled a second photographic lineup to include Suspect DONAN in position No. 2.

21.    Detectives Sasaki and Levesque met with Banker Christian Sanchez ("Banker Sanchez").  Detective Sasaki conducted a Blind Administration of the photographic line-up with Banker Sanchez.  The line-up was recorded on body-worn-video and uploaded into LAPD's case.

22.    Banker Sanchez positively identified MORRIS in Lineup No. 2, position No. 3, with "100% confidence."  Banker Sanchez positively identified DONAN in Lineup No. 1, position No. 2, also with "100% confidence."

23.    Upon completion of the photo line-up, Detective Levesque met with Banker Sanchez and conducted an interview. Banker Sanchez stated the following:

a.    Sanchez stated on the morning of May 16, 2024, at 1000 hours, he had an appointment scheduled with an individual named Gonzalez, Emmanuel (this was the person Banker Sanchez identified in a photographic lineup as DONAN), to close an account belonging to decedent Rosemary Peck.

b.    Banker Sanchez stated Gonzalez (DONAN) was almost an hour late to the appointment.  Banker Sanchez stated after Gonzalez (DONAN) missed his appointment time, he received a

phone call from a woman, advising she and Gonzalez (DONAN) were running late, and would arrive soon.

24.  Banker Sanchez stated Gonzalez and a female (MORRIS, per Banker Sanchez's photo lineup identification) arrived at the bank at approximately 1100 hours.  Banker Sanchez met Gonzalez (DONAN) and the female (MORRIS) and conducted the transaction in his office cubicle. Gonzalez (DONAN) informed Banker Sanchez that Victim Peck was his aunt, and recently passed.  Gonzalez (DONAN) possessed a death certificate for Victim Peck, and also possessed the Death Certificate for Peck's late husband. Banker Sanchez stated Gonzalez (DONAN) presented him with a California Driver License in the name of Gonzalez, Emmanuel.  Banker Sanchez stated he needed two forms of identification from Gonzalez.  Banker Sanchez recalled Gonzalez (DONAN) stated he did not have any other forms of identification but did have the debit card for his bank account in his Apple iPhone Wallet.

25.  Banker Sanchez stated Gonzalez (DONAN) tapped his iPhone on the card reader and fulfilled the two forms of ID requirement.  Banker Sanchez stated the process took many hours. Banker Sanchez stated he and Gonzalez (DONAN) engaged in small talk.  Banker Sanchez recalled Gonzalez (DONAN) informed him they drove to Santa Monica in a Tesla and parked the Tesla near the Taco Bell.  Gonzalez (DONAN) stated he and his girlfriend were newly dating and had only been together for approximately nine months.  Banker Sanchez stated he spoke with the female (MORRIS) who accompanied Gonzalez, but never caught her name.

26.   Banker Sanchez stated Gonzalez (DONAN) was very knowledgeable about the Peck Death Certificate, and her affairs. Banker Sanchez stated for every question he asked of Gonzalez, he received an accurate and detailed answer. Banker Sanchez recalled Gonzalez (DONAN) seemingly almost came to tears while speaking of his aunt, Victim Peck.

27.   Detective Levesque presented a business card in the name of Christian Sanchez, with the handwritten words "Size 10" and "Size 43" to Banker Sanchez and asked if he recalled the meaning of the written words.  Banker Sanchez stated Gonzalez (DONAN) claimed to sell Birkenstock sandals wholesale.  Banker Sanchez recalled telling Gonzalez (DONAN) he would buy a pair and informing Gonzalez he was a shoe size 10.  Gonzalez (DONAN) stated that the size 10 US, is a European size 43.  Banker Sanchez stated Gonzalez (DONAN) wrote down the two shoe sizes and was going to get him a pair.

28.   Detective Levesque presented Banker Sanchez with two purchaser's copies of Cashier's Checks drawn on the Victim Peck accounts.  Banker Sanchez stated he recognized both the Cashier's Checks as the check receipts issued by him to Gonzalez.

29.   Detective Levesque presented to Banker Sanchez a Death Certificate in the name of Rosemary Peck. Banker Sanchez recognized the Death Certificate, specifically because he recalled the cause of death.  Banker Sanchez stated he also recalled Peck died sometime in March.  Banker Sanchez explained

- 21 -

45 days must pass after an account holder's death before someone can contest the estate. Banker Sanchez recalled Victim Peck died in March, and on the day of the transaction they were around 50 days.

30. From reading the reports, I know Victim Peck died March 27, 2024. The 50th day was March 16, 2024.

31. Detective Levesque presented to Banker Sanchez a Transaction Receipt for a deposit totaling $75,267.15. Banker Sanchez identified the deposit as the deposit of Cashier's Check No. 0061004803 into Account Ending in No. 6204, belonging to Gonzalez.

32. Detective Levesque presented to Banker Sanchez a California Driver License in the name of Gonzalez, Emmanuel. Banker Sanchez recognized the CDL, the name and information on the CDL, as the person whom he issued two cashier's checks.

33. Eventually, Banker Sanchez stated he provided Gonzalez (DONAN) an internal document that needed to be notarized. Sanchez recalled Gonzalez (DONAN) was very pushy about getting the document signed immediately.

34. Banker Sanchez recalled after all the documents were complete, the female (MORRIS) was adamant for Gonzalez (DONAN) to deposit the money into his account. Sanchez recalled they argued about it for a minute, as Gonzalez (DONAN) stated he wanted to talk with his mom about how to best distribute the funds to the remaining family members. Banker Sanchez recalled saying he could issue a copy of the cashier's check for

accountability of the funds.

35.   Banker Sanchez stated he was not at work the following day when Gonzalez (DONAN) returned to withdraw money.

36.   Detective Levesque drafted an Affidavit of Adverse Claim to Restrain Access to Bank Account Pursuant to Financial Code Section 1450(a) and served the Affidavit on Wells Fargo Bank, 13455 Maxella Ave, Suite 114, Marina Del Rey, CA 90292. Personal Banker, Joseph Mejia took receipt of the Affidavit.

F. MORRIS and DONAN Broke into the Residence of Deceased Victim Peck.

37.   On May 28, 2024, Forensic Print Specialist Laird, John Serial No. N6090, LAPD Latent Print Unit, Technical Investigation Division (TID) responded to the Victim Peck residence and met with Victim Peck's niece, Langworthy.  Laird was able to lift three fingerprints from inside the residence.

38.   On July 15, 2024, Detective Levesque received notification from TID that the fingerprints obtained from inside the Peck residence matched to both MORRIS and DONAN.

39.   On May 31, 2024, Detective contacted Langworthy who stated her aunt, Peck Rosemary, was one of thirteen children. Langworthy stated Peck did not have any children, and none of her siblings had any children named Gonzalez, Emmanuel. Langworthy stated Victim Peck led a quiet and private life and did not have any renters in her home during her lifetime. Langworthy stated about one year ago, Peck advised Langworthy she was going to be added to her bank accounts, but it did not

happen.  Langworthy explained she has been responsible for her
aunt (Victim Peck) and was assisting in handling her affairs.

G. Wells Fargo Bank Records Confirmed MORRIS and DONAN Looted the
   Account of deceased Victim Peck.

    40.  On June 3, 2024, Detective Levesque drafted a Search
Warrant for Wells Fargo Bank records and submitted the Search
Warrant to Central District, County of Los Angeles, for review
and approval.  At 1515 hours, the Honorable J.D. Lord, Central
Magistrate Unit, Superior Court of California, signed the Search
Warrant.

    41.  On June 4, 2024, Detective Levesque responded to Wells
Fargo Bank at 1300 4th Street and served the Search Warrant.
Bank Manager, Steve Menendez, received the Search Warrant at
1155 hours.

    42.  Detective Levesque received a confirmation letter from
Wells Fargo Bank, Writs and Levies Dept. dated May 23, 2024,
that a hold has been placed on the Emmanuel Gonzalez Account
ending in 6204, freezing funds amounting to $68,829.15.

    43.  On June 6, 2024, Wells Fargo bank issued the Los
Angeles Police Department a cashier's check No. 0002776374, in
the amount of $68,720.02, Wells Fargo Case No. 47240224, from
Gonzalez account ending in 6204. The cashier's check was booked
into evidence at PAC Station.

    44.  On August 1, 2024, Detective Levesque received
notification from Wells Fargo Bank the financial records for
both the Peck Account and Gonzalez accounts were available for

download. The records were downloaded and stored in evidence.com.

45. Detective Levesque reviewed the records and observed the following on Gonzalez Account No. 2614706204:

    a.   On May 14, 2024, at 1550 hours, the account was established and $50 was deposited into the account.

    b.   On May 16, 2024, at 1356 hours, $75,267.15 was deposited into the account in the form of a cashier's check drawn on the Rosemary Peck account, Check No. 0061004803.

    c.   On May 16, 2024, at 1358 hours, $13,611.20 was deposited into the account in the form of a cashier's check drawn on the Rosemary Peck account, Check No. 61004804.

    d.   The records confirm $20,000 was withdrawn from Gonzalez bank account between May 16, 2024, and May 17, 2024, in three amounts, $2,000, $10,000, and $8,000.

    e.   On August 8, 2024, Detective Levesque received notification from Wells Fargo Bank the video files for Santa Monica Bank Teller window were available for download. Detective Levesque downloaded the files and stored them in evidence.com.

46. Detective Levesque reviewed the video files and confirmed it was MORRIS and DONAN at the Santa Monica Wells Fargo Branch, teller bank window on May 16, 2024, at 1406 hours, based on his comparison of the video to their DMV and booking photographs.

- 25 -

H. MORRIS and DONAN Arrested by LAPD

47.    From reading LAPD's reports, I know on May 18, 2024, LAPD Metropolitan officers located and arrested MORRIS in the MORRIS TESLA.  Officers located evidence in the vehicle of Identity Theft related to Pacific Area Burglary Case No. 2401-2926, discussed below.

48.    All items were recovered and booked at Pacific Station under Case No. 2400-3303.  The vehicle was impounded per 22655.5 VC, Evidence Hold.

49.    MORRIS and the driver of the MORRIS TESLA, DONAN, were transported to Pacific Station for an interview.  MORRIS and DONAN did not want to answer questions but provided false addresses to the police.

50.    However, after having seen and met MORRIS in person, the detective confirmed the person he observed on video from Advance Auto Parts, Pep Boys, and Hollywood Police Station, was MORRIS.

I. Officers Found Personal Items Belonging to the Deceased Victim Peck in the MORRIS TESLA.

51.    The arresting officers later told Detective Levesque, following the arrest of MORRIS, that they discovered fine china and collectible memorabilia in the rear of the MORRIS TESLA. Martin advised they left the items in the vehicle.  The vehicle was impounded during the arrest and remained at Viertels Tow under an Evidence hold.

52.    On May 20, 2024, Detective Levesque responded to

- 26 -

Viertels Tow – Northeast, located at 2010 N Figueroa St, Los
Angeles, CA 90065 to recover plates and memorabilia from the
MORRIS TESLA.

53.  Detective Levesque later contacted a niece of deceased
Victim Peck ("Langworthy").  Langworthy previously told the
detective that someone had broken into the residence of Victim
Peck and some fine china were stolen.  Detective Levesque sent
Langworthy eight photographs of items recovered from the MORRIS
TESLA.  Langworthy positively identified the items as property
owned by Victim Peck and taken from Victim Peck's residence. The
items were returned by police.

J. LAPD Detective Interviewed Victim Gars who Denied Knowing or
   Giving MORRIS Permission to Use his Identity

54.  On December 6, 2024, I spoke with LAPD Detective Steve
Franssen. Detective Franssen forwarded me an email from Andrew
Collins, General Manager of a company called "Blueground."  From
querying the internet and visiting their website, I learned
Blueground is a company that offers furnished apartments for
rent in cities around the world. According Detective Franssen,
he spoke with Andrew Collins of Blueground who told him a woman
had been applying for multiple apartments using different
identities.  I reviewed the email Andrew Collins sent to
Detective Franssen, and I observed three fake IDs in the names
of "Anis Gars," "Yueqin Quan," and "Sharareh Yedidsion," all of
which bore the photograph of MORRIS.  According to Detective
Franssen, Andrew Collins told him MORRIS applies for many

apartments using various identities.

55.   Detective Franssen also told me that sometime in November, 2024, he spoke with the real Anis Gars.  Anis Gars told him he did not know MORRIS, did not give MORRIS permission to use his identity.

K. MORRIS and DONAN Reside at the SKYE RESIDENCE and the PROMENADE RESIDENCE Under Stolen Identities.

56.   In December 2024, I was investigating the stolen identity "Anis Gars," and learned that MORRIS and DONAN were residing in an apartment rented under that name (the "Circa Residence").  However after speaking to apartment management, I learned MORRIS and DONAN have not paid rent, and may have abandoned the apartment unit.  A neighbor informed me, however, that the Circa Residence had a lot of foot traffic by seemingly random people after MORRIS and DONAN stopped using it around November 5, 2024. According to Circa Apartments management, people purporting to be Anis Gars (MORRIS) signed the lease in July 2024. They were previously staying at another apartment on Hope and Flower in Los Angeles under another identity prior to the Circa Residence. As discussed elsewhere in this affidavit, it is common for criminals who rent an apartment in a stolen identity to let their co-conspirators use the fraudulently rented apartment, especially after they have stopped doing so themselves.

57.   On December 23, 2024, I contacted the management for the apartment buildings near downtown Los Angeles where I knew

them to frequent.  I also shared a photo of MORRIS and DONAN.  I
received responses from managers of both the SKYE RESIDENCE and
the PROMENADE RESIDENCE.  On December 23, 2024, I received an
email from an apartment manager of the SKYE RESIDENCE who told
me they recognized DONAN and believe he was residing at the SKYE
RESIDENCE under the name of "David Regalado."

     58.  On December 27, 2024, an apartment manager told me
that she previously spoke with the mother of David Regalado who
complained that the true David Regalado was deceased and someone
had stolen his identity including to rent the SKYE RESIDENCE.
The apartment manager sent me a selfie photo of "David Regalado"
which was uploaded to the apartment application system during
the application process.  I recognized the photo of the
purported David Regalado as DONAN.  The apartment manager also
sent me a photo a white Tesla bearing the California license
plate number "9LXW516" parked at the assigned parking space for
the SKYE RESIDENCE, SPACE #638.  I reviewed DMV records for this
license plate and confirmed it was the MORRIS TESLA registered
to MORRIS. The apartment manager also told me DONAN had gotten
into a dispute with security so he was recognizable to them.  I
reviewed the lease agreement for the SKYE RESIDENCE.  The lease
was signed on November 6, 2024 and they moved in on November 7,
2024.  Included in the application was the last four numbers of
the social security for David Regalado.  According to an
apartment manager they are current on their rent but owe a small
amount.  The manager said DONAN told them they are not

- 29 -

frequently home and have to often travel for work.

59.   On December 30, 2024, I searched the Thompson Reuters Clear database, a privately owned website that pulls private and public records and found a deceased David Regalado with the same last four social security numbers. On December 30, 2024, I queried the Los Angeles County Medical Examiner's website and found a David Regalado who died on October 9, 2024.

60.   On December 30, 2024, I received a message from a manager of the Promenade Apartments.  The Promenade manager told me she recognized the photos of DONAN and MORRIS as residents at APARTMENT 1515 (PROMENADE RESIDENCE).  She said they were staying under the names "Dylan Lopez Gomez" and "Luisa Laguna Ramos." These tenants moved into this apartment on November 26, 2024.  They are current on their rent.

61.   On January 2, 2025, LAPD Detective Franssen told me he met and spoke with a different manager at the Promenade Apartments about MORRIS and DONAN.  This manager told Detective Franssen the manager recently shared an elevator with MORRIS. This manager again stated that MORRIS and DONAN (whom she identified by their photographs) rented APARTMENT 1515 (PROMENADE RESIDENCE) under the names of Colombian nationals, Dylan Lopez Gomez and Luisa Laguna Ramos. This manager said DONAN has caused problems for the security personnel of the building. The manager also said about two weeks prior, police were called to a domestic violence issue at the PROMENADE RESIDENCE.

- 30 -

62.   On January 6, 2025, I visited the SKYE RESIDENCE and
met with one of the managers.  The manager at the SKYE RESIDENCE
allowed me access to their DVR system.  In my review, I observed
both MORRIS and DONAN arriving at the building on January 5,
2025, at approximately 3am with suitcases in tow. The DVR
followed them from the lobby to the elevator.  The manager then
reviewed their access log and confirmed for me that MORRIS and
DONAN used the key fob for the SKYE RESIDENCE rented under the
stolen identity of David Regalado.

L. MORRIS and DONAN Appear to Be Hiding

63.   DONAN and MORRIS have been difficult to locate and
investigate:

a.    Over the course of three months, I have
identified at least three apartment units MORRIS and DONAN have
rented under stolen identities (including the SKYE RESIDENCE and
PROMENADE RESIDENCE);

b.    On January 2, 2025, I spoke with Los Angeles
County Probation Officer Aykaz Kiramityan who told me DONAN is
on probation for evading police, driving under the influence and
obstruction of justice.  DONAN has also failed report to
probation since December 2, 2024.  According to probation, DONAN
provided an address of 11324 Blythe Street in Sun Valley, CA.
However, as described in the affidavit, I know this not to be
DONAN's true address; DONAN is living at the SKYE RESIDENCE
under the stolen identity of David Regalado.  Probation also

told me DONAN is supposed to remain in Los Angeles County.

c.    On January 2, 2025, I spoke with Detective Bao of
the Dublin Police.  He said there was an outstanding warrant for
~~her~~ Morris' arrest in the amount of $180,000.  He did not know where
MORRIS was located and has been unable to arrest her.  The
address Dublin Police has for MORRIS is 206 W 6th Street #540, in
Los Angeles, California.

d.    On January 2, 2025, I reviewed the DMV records
for MORRIS and observed the same 6th street address.

e.    On January 2, 2025, I looked at USPS records and
saw MORRIS does not forward her mail to the SKYE or PROMENADE
RESIDENCES from this 6th street address.  I also checked the
Thompson Reuters Clear database.  Based on this search, I did
not find the SKYE or PROMENADE RESIDENCES associated with MORRIS
or DONAN.

64.    In my training and experience some identity thieves,
especially those who use fraud proceeds to fund their drug
habits, adopt itinerant lifestyles to stay ahead of law
enforcement.  These identity thieves, like MORRIS and DONAN,
often expose their faces to their victims because they know that
by the time law enforcement has identified them, they will be
gone.  Often they rent Airbnbs, hotels, or, like MORRIS and
DONAN, furnished apartments in the names of victims of identity
theft, so that they can rapidly shift from one address to
another.  Commonly they will abandon one address and the
identity in which it was rented whenever they believe their

cover is in jeopardy.  Some of the more sophisticated identity
thieves will even hand off their fraudulently rented apartments
to other criminals.  That is, they will rent an apartment under
a stolen identity and stay there for some months.  After they
decide to move on to a new apartment rented under a new name,
they may give the keys to their old apartment to their less
successful co-conspirators, who will continue to use the
apartment for drugs and identity theft even though the apartment
is no longer completely unknown.

M. DONAN AND MORRIS ARE INVOLVED IN DRUG TRAFFICKING AND MONEY
   LAUNDERING, PROBABLY SINCE 2021

      65.   A law enforcement database shows that a cellular
telephone registered in DONAN's true name has appeared as
recently as May 2024 in toll records in drug investigations
conducted by agents from Homeland Security Investigations and
the Drug Enforcement Administration.  While MORRIS's criminal
history mostly concerns fraud and identity theft, she has been
arrested also for drugs, resulting in a 2021 conviction for
possession of a controlled substance for sale.  In my training
and experience, many drug addicts turn to identity theft to fund
their drug habits.  Also in my training and experience, many
drug addicts become drug traffickers, which can range from
merely sharing drugs with their friends and co-conspirators, to
buying drugs in bulk and selling them to others for profit.  As
described below, it appears that MORRIS and DONAN are
professional drug traffickers as well as identity thieves.

66.  On January 6, 2025, I reviewed banking records for
DONAN.  From this review, I learned that from 2021 through the
last banking review of September 2024, DONAN received hundreds
of thousands of dollars of peer-to-peer payments from Apple
Cash, Cash App.  According to Bank of America, for example,
between March through September 2024, DONAN received about
$97,000 in unexplained peer-to-peer payments, which were
immediately withdrawn.  Records from other banks show similar
activity.  For example, U.S. Bank records show that between
February 2021 through July 2021, DONAN received about $95,000 in
peer-to-peer cash deposits.  In my training and experience,
criminals often pay each other through peer-to-peer electronic
payments.  Most commonly, I have seen such peer-to-peer payments
made to purchase drugs, such as fentanyl and methamphetamine,
but also to purchase counterfeit identifications.

67.  On January 6, 2025, I also reviewed banking and
financial records for MORRIS.  Bank records show that MORRIS has
engaged in various financial criminal activities, including
check fraud in 2024.  First Premiere Bank records state that in
2023, MORRIS was engaged in credit card fraud, specifically she
made twelve payments totaling about $5,000 and about $2,500 in
purchases. MORRIS then called the bank and claimed the purchases
she made were fraudulent, however the bank investigated her
claim and found that the purchases were made online utilizing
MORRIS' log-in information.  Additionally, the items purchased
were consistent with items she had purchased in the past, which

indicates that her claim of fraud was a lie.

68.  I also reviewed Cash App records from 2022 for MORRIS. According to these records, I learned that between March 2022 through July 2022, Cash App identified about 943 peer-to-peer transactions totaling almost $140,000 of five accounts including an account held by MORRIS.  These transactions were suspected of engaging in "illicit prison activity."  According to CashApp, the majority of the money transfers identified in the accounts contained comments and nicknames such as "k9," "from bh," "for diamond," "for tasha," and "for fingerz," which suggests that "funds were to be transferred to a third party who is currently incarcerated or on behalf of a third party that is currently incarcerated.  A sampling of the Cash card transactions notated several prison/inmate related activities such as 'GTL*INMATE PHONE SVC'. Based on patterns known to Cash App, this activity suggests the Cash App account owners are transferring funds primarily to/from incarcerated individuals and/or facilitating illicit prison activity."

N. TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT AND DRUG TRAFFICKING

69.  From my training and experience, and from discussions with other investigators with dozens of years of experience investigating counterfeit identity documents, identity theft, money laundering and fraud I know the following:

a.  Makers of counterfeit identity documents must maintain specialized equipment and supplies to craft convincing

counterfeits of drivers licenses and other identity documents, such as card printers, cameras, raised printers, laminators, die cutters, etching equipment, scoring and cutting tools, ultra-violet printers, holographic printers, magnetic stripe and/or chip encoding devices, ink and cartridges for the required printers, pvc cards, Teslin sheets, holographic self-adhesive sheets, laminating sheets and pouches, specialized glues and adhesives, and various computers and software required to design identifications as well as operate much of the above described equipment.  Much of this equipment can also be used to create counterfeit checks, credit cards, and other financial instruments, so many identity document counterfeiters are also involved in fraud generally.  Typically, criminals store such equipment and supplies where they feel it is safe and readily accessible to them, most commonly at their residence.

b.  Counterfeit identity documents are often used to commit identity theft.  That is, criminals purchase counterfeit identity documents so that they can impersonate particular individuals, for example to withdraw money from a bank, to negotiate a counterfeit check, or use a stolen or counterfeit credit card.  In more sophisticated operations, false identity documents have been used to obtain mortgages when the criminal tricks a lender or notary into believing that the criminal is the real homeowner.

c.  Individuals involved in identity theft and fraud schemes must keep evidence of their schemes, such as victim

information and accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

d.  Counterfeiters of identity documents have to possess the identifying information that is to be written on the documents they will produce, such as names, drivers' license numbers, social security numbers, addresses, ID-sized photographs, signatures, and so forth.  Typically, this information is transmitted and stored digitally.

e.  Professional identity document counterfeiters are often paid in cash, as all those involved seek anonymity.  More recently, some use cryptocurrency or peer-to-peer payment systems like Venmo or Zelle to receive their payments. Regardless of the payment method, professional counterfeiters must keep track of which customers have paid them in order to stay in business.  Commonly this is done digitally.  Many professional counterfeiters will deposit some of their cash proceeds into bank accounts, or use them to purchase money orders or cryptocurrency, so that they can spend the proceeds at places that do not commonly accept cash payments, such as for rent, or store the proceeds safely.

f.  Generally, perpetrators of fraud and counterfeiting schemes maintain the evidence described above where it is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person. For larger or more sophisticated frauds, participants often

attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

g.    Members of a criminal conspiracy must communicate with one another out of necessity.  Commonly this is done by text, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone.  Members of the conspiracy commonly carry their smartphones, which include the contact information for their co-conspirators, on or near their persons, such as in their cars or residences.

h.    Individuals involved in money laundering, and structuring schemes usually keep evidence of their schemes, such as pay-owe sheets, contact information for their co-conspirators, suppliers and customers, and records documenting the movement of criminal proceeds on their digital devices, which they usually keep on their persons, in their vehicles, and in their residences.

i.    Fraudsters and money launders often maintain on hand large amounts of United States currency or cryptocurrency in order to maintain and finance their ongoing drug trafficking businesses. Such currency is often stored in their residences and vehicles.

j.    Communications between people buying and selling identities and counterfeit documents usually take place by

- 38 -

telephone calls and messages, such as email, text messages, and encrypted messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.

k.    It is common for fraudsters to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

O. <u>FEDERALLY INSURED FINANCIAL INSTITUTIONS</u>

70.    In my training and experience, all the financial institutions mentioned in this affidavit are federally insured. Also in my training and experience, it is all but impossible for persons to use smartphones and the internet without causing wire communications to cross state lines.  Internet communications are broken down into packets and sent by whichever route is most available at the time, which means that some of those packets are likely to cross state lines even if the sender and recipient are both in the same state.  Further, major corporations, including telecommunications companies, generally maintain back-

up data centers in different states to ensure that their data is not destroyed by a natural disaster, such as a wildfire, that might affect a data center in one state.

P. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

71. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

72. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to

inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

      73.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be

unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to ~~every person~~ HAILEY HAZEL MORRIS and/or FRANKLIN DONAN who is located at the SKYE RESIDENCE during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

74.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

- 44 -

IV. **<u>CONCLUSION</u>**

75.  For the above reasons, there is probable cause to believe that HAILEY HAZEL MORRIS and FRANKLIN DONAN violated 18 U.S.C. §§ 1349 and 1028A (conspiracy to commit bank and wire fraud, and aggravated identity theft), and that evidence, contraband, fruits, or instrumentalities of the Subject Offenses will be found at the SKYE RESIDENCE and the PROMENADE RESIDENCE.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>7th</u> day of
January, 2025.


_____
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR

- 45 -